Eastern Dist.
Feb'ry, 1829.

*SAUL* vs. *HIS CREDITORS.*

SAUL
vs.
His Creditors

APPEAL from the court of the first district.

PORTER, J. delivered the opinion of the court. The children of the insolvent were placed on the tableau of distribution by the syndics, as privileged creditors, for the following sums:

1st. Amount inherited by the surviving heirs of Mary Saul, by the death of their brother, John D. Saul, and the second marriage of their father; which amount is not subject to execution or the payment of debts, but is to be held by the father with the privilege of the usufruct during his life,   $9015 34

Interest on do. at 5 per cent. per annum from the date of the cession of his property, say 6th March, 1826, to 3d March, 1828,   897 81

To a judgment rendered by district court and confirmed by the supreme court in favor of the heirs of Mary Saul, on the 3d May, 1827, with interest,   $77,756 94

The authority of the thing judged does not depend on the points raised in argument, but on the matters put in issue by the pleadings.

When the syndics are suffered to litigate the claim of a creditor without any interference or opposition of the other creditors, the judgment rendered has the force of *res judicata* against all the parties to the *concurso.*

Whether a judgment rendered between two of the creditors would have that effect, *quere.* Interest does not run on a judgment.

If interest be demanded in the petition, and the judgment be silent on it, a subsequent demand can-

Eastern Dist
Feb'ry 1829.

SAUL
vs.
His Creditors

not be made
for interest.
When a
judgment is
set up as the
basis of a de-
mand, the par
ty to whom it
is opposed
may avail
himself of
any limita-
tion in his fa-
vor without
pleading it.
Syndics have
no control o-
ver the suits
which the in-
dividual cre-
ditors may
raise with
each other in
the *concurso.*
Where
a meetin.
takes place
before a nota-
ry by order of
court, to de-
liberate on
the mode of
selling the es-
tate, and the
creditors dif-
fer as to the
terms of pay-
ment, the pri-
vileged credi-
tors cannot
by an *exparte*
proceeding
obtain an or-
der of court
to sell the pro
perty for
cash.

| | | |
|---|---:|---:|
| Brought over, | $77,756 | 94 |
| Interest from 3d May to 20th September, 1820, on $54,092, | 1,632 | 32 |
| | 78,787 | 26 |
| By payment as cash, | 39,000 | 00 |
| | 39,787 | 26 |
| Interest on $39,787 26, from 20th Sept. to 1st March, 162 days, | 822 | 78 |
| | $40,679 | 04 |

To this tableau, several creditors filed opposition; among these, the Bank of the United States, the Bank of Louisiana, the State Bank and the Bank of Orleans, offered the following.

1. The heirs of Mrs. Mary Saul are put down as creditors for the sum of $86,722 28, whereas by their own shewing they are only entitled to be placed as creditors for the sum of $54,092 24.

2. That interest is allowed to the said heirs, to which they are not entitled.

3. That a large sum of money, the proceeds of the sale of bank stock, and other moveables, has been illegally paid to the said heirs, and

that they are classed as privileged creditors, although in fact they have no privilege.

4. That the sums charged for the plantation expenses are highly extravagant, and particularly, they object to all the sums charged as having been paid to Thomas H. Saul, for his services.

And if they do, and a sale takes place at which the privileged creditor who obtains the order buys the property himself, the sale will be set aside.

5. That the sale of the plantation in the parish of Plaquemine, is wholly null and void, and ought to be set aside, because the same was not made at the time, nor upon the terms directed by the creditors, but in pursuance of an *ex parte* order of court, and that the same was not made at the seat of justice of the parish of Plaquemines, but at New Orleans.

6. That the sale of the plantation in the parish of West Baton Rouge is void, because not made at the seat of justice of that parish, and not in pursuance of the direction of the creditors.

7. That it was the duty of the syndics to have received the crop of the plantation in the parish of Plaquemines, and to have accounted for the same in their tableau of distribution, and that they are responsible for all damages which may result from such neglect, amount-

ing to a large sum of money, viz: the sum of thirty thousand dollars.

8. That the charge of $396 87 for negro board ought not to be allowed, the same being much more than compensated by the services of said negroes.

To these grounds of opposition the heirs replied: That the amount for which they had been placed on the tableau of distribution, as well as their rank thereon, had been fixed by a judgment which had the force of *res judicata*, and that it was otherwise well founded in law: that the sales objected to, were made in pursuance of law, and that the respondents being the *bona fide* purchasers, the fruits gathered by them are and ought to be their own.

They further prayed, that the suits which the opposing creditors had brought to have the sales set aside, might be cumulated with their proceedings, and that should they be evicted, enquiry might be had into the value of the improvements placed by them on the premises.

The court of the first instance overruled the opposition, and confirmed the tableau. The Bank of Louisiana, the Bank of Orleans, and the Bank of the United States appealed.

The three principal questions in the cause,
are: 1st. The right of the minor children to
be placed on the tableau of distribution as pri-
vileged creditors.   2d. Their claim for inter-
est.   And, 3d. The regularity of the sales
made for cash.   We shall examine them in
this order, in preference to that in which they
are stated in the opposition, and then pass on
the minor questions which may be necessary
to a decision of the case.

I. The right of privilege is supported on two
grounds: first, a judgment of a court of com-
petent jurisdiction having the force of *res ju-
dicata*, and, second, on principles of law, in-
dependent of any former decision between the
parties.

To understand correctly what force should
be given to the plea of *res judicata*, recurrence
must be had to the pleadings in the other case,
as well as to the judgment therein rendered.

On the first tableau of distribution, the heirs
of Mary Saul were entirely omitted.   To the
homologation of that tableau they filed an op-
position, in which, after stating that they were
legitimate heirs of Mary Saul, the wife of the
insolvent, who had died in Louisiana, leaving

Eastern Dist
Febr'y 1829.

SAUL
vs.
His Creditors

a large estate in community with her husband, their father, they aver, that the portion of each was $9015 34: that the insolvent Joseph Saul, became their tutor, "and on the 3d of August, 1819, took possession of and administered the property inherited as aforesaid, *whereby all the property of the said Joseph Saul became tacitly mortgaged for the payment of the said sum of money, with interest at five per cent. per annum, from the 3d day of August,* 1819: which said sums, with interest as aforesaid, the said Joseph Saul heretofore acknowledged to be due, and promised to pay."

They conclude by praying "that the tableau of distribution filed by the syndics may be annulled, and that they may be placed on the said tableau *as general mortgage creditors*, each of them for the sum of $9015 34, with interest at the rate of five per cent. per annum on each sum, from the 3d August, 1819, and that the said syndics be ordered to pay to each of them, *in preference to every other creditor, or creditors*, the said sum of money," &c. &c.

The judgment of the court, on this opposition, and some others of minor consequence,

not necessary to be specially set out, (after de-
claring certain law charges to be privileges of the highest nature) directs them to be paid, and proceeds as follows—"next are to be ranked the claims of the children of Joseph Saul to their respective proportion of their mother's succession; their opposition is therefore sustained to the amount of one half of the community at the time of her death, by virtue of a *tacit and general mortgage.*

On appeal to this court, the judgment just set out was confirmed.

It has been urged on the court that the questions as to the amount due the minor heirs, and the rank of their privileged mortgage, were not brought into view, nor discussed before this tribunal, when the judgment of the parish court was confirmed. This is true: nothing was said of them. The whole attention and argument of counsel were directed to the great question, whether there existed a community between the father and mother: and the court took no notice of matters which from the silence of the parties they presumed each assented to. But admitting these facts, the consequence to be drawn from them is not what

the appellants contend—namely, that the judgment has not the authority of the thing judged. It is obvious that when the plea of *res judicata* is presented to a court for examination, it is not to be decided by the points which the parties may have raised in argument, but by the matters put at issue by the pleadings. The judgment has as much effect on those things embraced by it, which were not disputed, as it has on those which were.

Recurring therefore to the pleadings and the judgment, we find, that the heirs claimed to be paid *by virtue of their tacit and general mortgage, in preference to every one.* The judgment of the court directs them to be paid in preference to every one, except law charges, *by virtue of their general and tacit mortgage.* We think this judgment forms *res judicata* to all the parties to it at the time it was rendered, and that it is now too late to call the correctness of that judgment in question.

The matters therefore being the same in this suit with that already decided, we have only to enquire whether the parties are the same.

The parties in the former suit were the syndics of the estate who refused to put the heirs

on the tableau, and the heirs who filed an op-position on the failure to do so. In that suit the syndics represented all the creditors of the estate. It is true that in a *concurso* all are plaintiffs and defendants, and each may contest the claim of the other, if the syndics refuse to do so. A judgment between two creditors on such opposition would not perhaps form *res judicata*, except as between them. But where the individual creditors stand by, and suffer the syndics to litigate the demand of any person claiming to be paid out of the estate, the judgment is as binding on them as if given contradictorily with themselves. The syndics are their agents, and any other construction would introduce the extraordinary consequence, that no judgment homologating a tableau of distribution would have the authority of the thing judged on any claim placed thereon, unless each of the creditors on the tableau, had contested it, and joined issue on its validity.

This opinion renders it unnecessary to examine the other point whether, independent of the judgment, the minor heirs had not under our old code a privilege on all the moveables

Eastern Dist.
*Feb'y*, 1829.

SAUL
*vs.*
His Creditors

as well as immoveables of their tutor. There is no doubt they possessed it by the Spanish law, and we may notice before we dismiss the point from our consideration, that it seems very difficult, if not impossible to distinguish this case from a variety of others, so often decided in this court; where we have held, that subsequent laws do not repeal former ones, by containing *diffcrent* provisions—that they must be *contrary*, to produce that effect.

The next important question in the cause, is in relation to the interest. On the tableau of distribution the heirs are placed as privileged creditors for the sum of $77,756 94, in virtue "of a judgment rendered by the district court, and confirmed by the supreme court, in favor of the heirs of Mary Saul, on the 3d May, 1827, with interest."

The opposition of the creditors states that by their own shewing they are only entitled to be placed on the tableau for $54,092 24.

It becomes therefore necessary to examine the pleadings and the judgment to see which of these sums they are entitled to. The difference is produced by the interest. One of the parties asserts, it was accorded by the judg-

ment of the district court, confirmed in this tri-
bunal. The other avers that by the terms of

the judgment the interest was denied.

The opposition to the first tableau of distribution was made by six of the heirs of Mary Saul; the same individuals who are now placed on the tableau of distribution. Two of these who were majors presented their claims separately, and the minors, who were assisted by a curator *ad lites*, offered theirs in two several oppositions.

The language of all in relation to the matter now under consideration is the same. After stating their heirship; the marriage of their mother; her community in property with their father, the insolvent, and her decease; they proceed to state, that their father was by law their tutor, and on the 3d day of August, 1819, took possession of and administered "the property inherited as aforesaid; whereby all the property of the said Joseph Saul, became tacitly mortgaged for the payment of the said sum of money, (9015 34 for each heir) with interest at five per cent. per annum, from the third of August, 1819, which said sum, with interest as aforesaid, the said Joseph Saul heretofore acknowledged to be due, and promised to pay.

The oppositions conclude with a prayer, that the heirs may be placed on the tableau as general mortgage creditors, each of them for the sum of $9015 34, with interest as aforesaid, and that the syndics may be ordered to pay each of them the said sum of money, *with interest as aforesaid, or so much interest as the court may consider due.*

The judgment of the court sustains the claim of the children "to their respective proportions of their mother's succession; their opposition is therefore sustained (says the judgment) *to the amount of one half of the community at the time of her death,* by virtue of a tacit and general mortgage."

It is clear to us, the claim for interest cannot be sustained under this judgment. Interest is, it is true, demanded by the opposition, but the judgment is entirely silent about it: or, to speak more correctly, by its terms, excludes and rejects the claim: for it confines the recovery of the children to the one half of the community at the death of their mother. *The one half of the community at her death,* is an entirely different thing, from *the one half of that community eight years after,* with inter-

est thereon at five per cent. for that space of time.

There cannot therefore, we think, be a doubt, that the interest was *not* given by the judgment. It is silent about it, and we are ignorant of any law which makes the interest follow as a consequence of giving judgment for a debt which would bear it; even if the terms conveyed less strongly than they do in the decree of the district court in this instance, the idea that it was excluded. By *the third law of the 22d title of the 3d Partida*, it is enacted, that if a judge in rendering a final judgment concerning the principal thing in dispute, has omitted to mention its fruits or rents, or had not condemned the party cast to pay the costs, he might amend and rectify his judgment, if done on the same day the decree was given. Such a provision as to the necessity of an amendment, conveys most strongly the idea, that without it the fruits or rents would not follow the judgment as a consequence, and this positive rule is certainly in conformity with the general understanding on the matter, as it is with the decision of this court, in the case of *Saunders* vs. *Taylor*, *vol.* 7, 44.

But does the failure to give interest in the judgment, enable the defendants to set up the decree as *res judicata* against a second demand for that interest? This is a question of by no means such easy solution as that just disposed of. Had the judgment in express terms rejected interest, there would have been no room for argument, that it furnished to the parties opposing the claim, the plea of *res judicata* against a second demand. We think, there is equally a rejection of the claim, when both principal and interest are demanded, and the former alone is given by the decree. Both were asked for in the petition: both put at issue by the pleadings: evidence in support of both is found in the record, and the judgment of the court must consequently be presumed to have taken both into consideration, unless an express reservation was made in it of one of them. The Roman jurists, in obedience to the maxim that the whole includes a part, held, that the exception *rei judicatæ* applied to any one of the things which formed the object of the previous demand. *Si quis cum totum petiisset partem petat, exceptio rei judicatæ nocet.* The same rule prevailed when several distinct

things were demanded.   This case cannot af-
ter the severest attention we have been able to

bestow on it, be distinguished from others, in

which the soundness of the doctrine just stated
would appear incontrovertible.  If a suitor
ask for $1000 from the party against whom
the action is brought, on a particular cause, or
many causes, and a judgment be given general-
ly for $700, the balance claimed is necessari-
ly excluded.   So it would be if he demanded
ten acres, part of a certain tract of land, and
only recovered five.  Why it should be other-
wise when he claims money and interest, and
only gets the money, it is difficult to conceive.
The supreme court of New York state, that
when the demand of a party is submitted to a
jury, and they see fit to disallow it, either for
want of proof, or for any other cause, a ver-
dict and judgment thereon is conclusive, and
the same demand is barred for ever.  In the
case of *Delahaye* vs. *Pellerin*, decided in this
state, it was held that where the plaintiff had
claimed a slave and damages for his detention,
a judgment for the slave, without saying any
thing of the damages, excluded a claim in a
second action for the damages.  In the case

of *Faurie* vs. *Pitot*, it was decided that interest cannot be sued for in a separate action, and that when judgment had been obtained for the principal, the interest which was an accessory was lost. This decision is in strict conformity with a text of the Roman law. *Non enim duæ sunt actiones, alia sortis, alia usurarum, sed una: ex qua condemnatione facta, iterata actio, rei judicatæ exceptione repellitur.* 2 *Martin Rep.* 82. *Code Liv.* 4, *tit.* 34. *No.* 4 *Dig.* 44, *tit.* 2, *Law.* 7. 16 *Johnson* 138. 2 *Martin,* 142.

If we felt the force of these principles less strongly than we are compelled to do, and thought that we might examine the question of interest again, if in point of fact it was not acted on in the previous judgment, we should entertain strong doubts whether it did not enter into the consideration of the judge of the first instance, and was by him excluded. In endeavoring to satisfy our minds on this point, we leave out of view the confirmation of that judgment here. In this court, the question of interest was never that we can recollect once agitated, and no complaint was made that it had not been granted by the judgment in the

first instance. But we can hardly believe that

the judge below, when the interest was de-
manded, and proof offered in support of it,
never took that demand or proof into conside-
ration in fixing the amount which the heirs
should recover. Certainly every legal pre-
sumption is against such a conclusion; more
particularly when from the terms of the decree,
he limits their recovery by express terms to the
amount of the community at the death of the
mother. He may at least have equitably
thought (and whether he might not have legal-
ly too so concluded we are not now permitted
to enquire) that the support and education of
the minors were fully equivalent to the inter-
est of their money. Nor is this view of the in-
tention of the judge the least weakened in our
minds by the circumstance of the decree not
making any mention of it. It not being the
practice in this state to express in the decretal
part of a judgment rendered in favor of a
plaintiff, what portion of his claim cannot be
allowed, though it is frequently done in the
reasons by which final judgments are pre-
faced.

There remains one consideration on this

Eastern Dist part of the case, and that is, whether the ap-
*Feb'ry* 1829.
pellants can claim under the pleadings the be-
Saul
*vs.*    nefit of the judgment.   They do not specially
His Creditors
set it up in bar to the claim of the heirs, tho'
we think they have substantially done so.   On
the tableau of distribution the heirs are stated
to be placed there for a certain sum, in virtue
of a judgment with interest.   The opposition
avers, that the heirs by their own shewing are
only entitled to a sum, which appears on re-
ference to the decree first given, to be the prin-
cipal, without interest.   When a judgment is
presented as the basis of a demand, it would
seem to follow as a necessary consequence of
admitting it in evidence, that the party to whom
it is opposed may avail himself of any limita-
tions it contains which are favourable to him.

This brings us to the last question in the
cause which materially affects the interests of
the parties, and that is the validity of the first
sale made by the syndics.   The heirs were the
purchasers, and bought a sugar plantation on
the river Mississippi, having 40 arpents front
by 40 deep, together with all the improvements,
and sixty-six slaves, for $35,000.   They also
bought at the same time for $4,500, a tract of

land, with the improvements, in the parish of West Baton Rouge.    It was complained that this sale was illegally ordered; irregularly executed; and that a great sacrifice of the property took place.

First, as to the legality of the order.

At a meeting of the creditors, before a notary, on the 10th July, 1827, a majority of them decided on selling the property at one, two and three years credit.   The appellees however, and some other creditors, voted that a sufficient portion of it should be disposed of for cash to pay the privileged claims.   These proceedings were returned into court on the 17th of the same month, and on the 26th the following order was made.

"On motion of A. Hennen and E. Mazureau, Esquires, of counsel for Julia D. Saul, and others, children of the said Joseph Saul, it is ordered by the court, that the syndics of the creditors of the said Joseph Saul do proceed forthwith to sell for cash, after the advertisements required by law, so much of the property ceded by the said Joseph Saul, on which the children have a special and legal mortgage, as will be sufficient to pay and satisfy the amount of their

claims; viz: the sum of $77,756 94, with legal interest on the said sum since the judgment in their favour."

On the same day this order was obtained, on the 26th July, a copy of it was delivered to the sheriff, by whom service was made on the syndics on the 28th and 30th of the same month.

By an acknowledgment on record, signed by the counsel of one of the opposing creditors, it is admitted that verbal notification of this motion was given to two of the syndics, and it appears that while the property was advertised for sale according to the order of the court, they filed a petition for the appointment of appraisers, and that appraisment was duly made.

It makes a part of the case, according to the record, that all judgments and decrees of the district court, since the cause was sent back from this tribunal, shall be considered as directly appealed from.

On the part of the appellants, it has been urged, this order was *ex parte*, and is not binding on the creditors. The appellees contend, that the rule of law being peremptory that a

sale should be made for cash, notice was un- necessary: that if it was, the syndics were substantially informed of it, and that they ac- quiesced in the decree of the court by praying for an appraisement of the estate.

It is to be regretted, that the legislature have not furnished any rules for conducting the suit of *concurso.* The proceedings in it are so materially different from ordinary actions, that the regulations furnished for the one have lit- tle or no application to the other. But there are certain fundamental principles which con- trol all causes, in every court, and in every country, where justice is not a mockery, and law is not used as a cloak for oppression. Par- ties must be cited, and after being cited an op. portunity must be afforded them to make de- fence before they are condemned. We had occasion to express our opinions fully on this subject, in the case of *Ludeling* vs. *his credi- tors,* and further reflection has confirmed us in the correctness of the views we then enter- tained. In that case, the court, without any written opposition being filed to the tableau of distribution, permitted objections to be made to it orally, on the day it was called up for ho-

Eastern Dist. mologation, and by the judgment rendered,
*Feb'ry*, 1829. changed the relative situation of the creditors.

SAUL We considered the proceedings irregular, and
*vs.*
His Creditors reversed the judgment of the inferior court,
because the creditors who had already their
rank assigned them, could not know without
being warned by the pleadings that it was ne-
cessary for them to appear in court, and sup-
port their pretensions.    *vol.* 4. 601.

A good deal of embarrassment is created in
the conducting of cases in *concurso*, from con-
tradictory, and we think indistinct, views that
are taken in relation to the powers of the syn-
dics.    An authority has been read to us, that
they are the representatives of the mass, but
not of particular portions of the creditors when
they oppose each other.    This we think true:
for in this action all are plaintiffs and defend-
ants, and each may, if they think proper, con-
test and put at issue, the claims of others, both
as it regards the existence of the debt and its
rank.    And yet this rule must be understood
and taken with limitations.    If the syndics re-
sist the claim of an individual creditor, put it
at issue, and a trial be had, and judgment ren-
dered thereon, that judgment as we are at pre-

sent advised, would prevent a particular credi-

tor from objecting to the claim at any subse-
quent stage of the proceedings. The syndics
being suffered to contest the claim on behalf
of all, without intervention on their part, can
be considered in no other light but their re-
presentatives, and it would be intolerable when
collusion was not alleged, that the case should
be tried over and over again, on the opposi-
tion of every individual creditor. The con-
sequence however which we attach to a judg-
ment so rendered is founded in the presumed
acquiescence in all the proceedings, and we
are far from thinking that an acknowledg-
ment on the part of the syndics, prevents any
person who has an interest in contesting a
claim against the estate, from making oppo-
sition to it.

But it is certain that the syndics cannot
control the suits which individual creditors
may raise with each other. This results as
well from the authorities on this subject, who
all state that every creditor is at once plaintiff
and defendant, as from the nature of the case
and the duties which syndics have to perform.
Appointed to sell the estate, collect the debts,

Eastern Dist
*Feb'ry* 1829.

SAUL
*vs.*
His Creditors

and pay the creditors their respective propor-
tions, it is in many instances a matter of com-
plete indifference to them whom they are to pay
or in what rank the particular creditors are
marshalled on the tableau. Or if they have
any interest as creditors, it may not unfrequent-
ly happen that it is favorable to a particular
class of claims, whose privilege or mortgage
others may wish to exclude or reduce. The
law therefore has wisely not confined to them
alone the assertion of rights, and the settling
of questions, to which they may be indifferent·
but which to others are of primary importance.
It has reserved to the parties really interested
the power to watch over their own interests, and
protect themselves in their individual capacity.
The contrary doctrine would at once establish
an authority in the syndics to settle the estate
as they chose, and would render the privilege
of each creditor to contest the claim of another
a mere illusion.

With this expression of our understanding
of the law, we proceed to examine the parti-
cular circumstances of this case. The syn-
dics had contested the claim of the appellees
on behalf of the other creditors, by refusing

to put them on the tableau, a judgment was rendered on the issue thus joined, and that judgment we consider binding and conclusive on all parties to the *concurso.* After this judgment was rendered, the syndics applied to the court, and obtained an order that a meeting of the creditors should take place before a notary, to determine on the mode of disposing of the ceded property. At that meeting a contest arose, in relation to the manner the effects of the insolvent should be sold. Several creditors appeared and voted for its being disposed of on a credit. Others, among whom were the appellees, required a sale for cash, to satisfy the privilege claims. The notary made a *process verbal* of the wishes and demands of each, and returned it into court. These conflicting pretensions produced a new contest between the creditors, and the moment it was commenced the syndics in our judgment could do no act on their part, either to weaken the rights of one party or strengthen those of the other. The controul of it was in the hands of those who had chosen to litigate it in their own behalf, and no sale could be made until the conflicting pretensions of the creditors were de-

Eastern Dist
*Feb'y*, 1829.

SAUL
*vs.*
His Creditors

cided on. Before the court decided, it was bound to hear the parties. We see no other conclusion to which we can possibly come, if the creditors had a right to make the opposition. For if they had a right to make it, they had a right to be heard on it. It is not either the smallness of a claim, nor its weakness in point of fact, or law, that can deprive a suitor in our courts of the privilege of presenting his proof, and his reasons before a decision is made against him. In this case, without a hearing of the parties interested, and without giving them an opportunity of being heard, a judgment overruling their pretensions, and mate. rially affecting their interests was rendered.

But several grounds have been urged to take this case out of principles we have just been noticing.

Verbal notice it is said was given to the syndics, and they made no opposition. We have already said, it was not with them, but with the individual creditors, the suit should have been carried on. But admitting that it might be contested with them, as the representatives of the creditors who demanded a sale on a credit, they had no authority to give a verbal

consent out of court, so as to deprive the proceedings of that publicity which would enable the parties really interested to protect themselves. Their authority in the most favoured view that can be taken of it, did not extend so far: far less did it authorise them, after the portion of the creditors they represented had contested the claim to sell for cash, to acquiesce in that claim without opposition. And as if the case had been destined to exhibit every kind of irregularity, notice was only given to two of the syndics, one of them the father and forced heir of the appellees. The third received no notification. Were then the syndics the persons with whom the claim should have been contested, we would be of opinion that the proceedings had been contrary to law.

It has been forcibly urged, that the right of the privileged creditors to have a sale made for cash was peremptory, that no successful opposition could have been made to it. Admitting it to be peremptory, does it follow that no notice is to be given to those who are to be affected by this positive right, and that no opposition can be made to it? Is the right of the privileged creditor to have a sufficient portion

of the insolvent's estate sold for cash to pay his claim, stronger than that of the payee of a bond to recover the amount from the maker. Is it conferred more expressly, or by higher evidence than that of the mortgage creditor, to seize the property on which he has a lien, in the hands of a third person? and could these rights be exercised without giving the debtor in the one instance, and the third possessor in the other, an opportunity to shew what cause they had to urge against the apparent claim of the creditor? There are more things to be settled in all cases of this kind than the mere right of selling for cash. It must be first ascertained whether the party making the demand is a privileged creditor, and next the amount due to him, and neither of these are the result of a peremptory rule of law, but depend on the proof offered. If another case had been presented for our decision, the imagination could not have suggested any thing by way of illustration which would have more strikingly shewn the necessity of hearing parties before making such an order, than the instance now before the court. On a judgment which only gave to the creditors in favour of whom it was

rendered 54,000 and some dollars, an order was made to sell property to satisfy one of $77,000.

We have enquired whether this proceeding might not be supported on the ground, that after the return of the proceedings before the notary into court, the parties to the *concurso* must be supposed to have been then, ready to meet any motion that was made affecting their interests. But neither the law nor the practice of the court will, we apprehend, justify this position. It is not in the power of either plaintiff or defendant to call up an ordinary case at any moment he pleases, and try it in the absence of his adversary. It must be put on the docket, and a day fixed for its trial. It is of more importance to require a strict observance of this rule in the *juicio de concurso*, than any other; for from the number of parties litigating, and the variety of suits carrying on at once, an opportunity might be afforded of materially affecting the interests of litigants by *ex parte* proceedings. It surely cannot be the law of this country, that the creditors must keep a counsel standing as a centinel for years in court, from the moment it opens until it closes

Eastern Dist.
Feb'y, 1829.
SAUL
vs.
His Creditors each day, to guard against his adversary getting an order on his shewing alone. If it be the law, then the necessity of a citation might as well be dispensed with entirely.

It was asked, who were the privileged creditors to give notice to? We answer, to those opposed to them. We see no difficulty in this. When a tableau of distribution is filed, notice is given to all parties, by publication in the newspapers to oppose it if they think fit. Nothing prevented the same kind of notice, calling on those interested to shew cause why the proceedings before the notary should not be homologated. It is said there is no law for this. There is no statutory provision it is true, but the act of 1817, by declaring that it shall no longer be necessary to homologate the proceedings for the appointment of syndics, strongly countenances the idea, that all other proceedings before a notary require as formerly to be acted on by the court after calling in the parties by public advertisement. But if there be no law for bringing the creditors in by publication, a rule could have been taken on them to shew cause why the demand of the appellees should not be granted.

It makes a part of the statement of facts, that one of the counsel who appeared on the argument of this case on behalf of the appellants, was in court, and made no opposition, when this order was granted: admtting his silence to bind his clients, he was not the representative of the other creditors.

On the whole, after bestowing on the case the most serious attention, we are of opinion that the order of the court rendered *ex parte* without hearing the parties, or citing them to be heard, was illegal, and that the sales made in virtue of it, to those by whom it was obtained, must be set aside.

The legality of the order for selling the bank stock is not put at issue by the opposition, and no evidence before us shews the sale to have been made contrary to law.

The appellees have claimed the value of their improvements as *bona fide* possessors. There has been no evidence in argument on this point. That question, therefore, and others arising out of the fruits of the property, can be more properly determined when a new sale takes place, and the tableau is amended conformably thereto.

Eastern Dist
*Feb'ry* 1829.

SAUL
*vs.*
His Creditors

It is therefore ordered, adjudged and decreed, that the judgment of the district court be annulled, avoided and reversed; that the opposition filed thereto, so far as it relates to the amount for which the heirs of said Mary Saul are placed on the tableau be sustained, and that they be placed thereon for the amount recovered by them in the former action. It is further ordered, that the said opposition, so far as it relates to the sale of the bank stock and furniture, be overruled.

It is further ordered and decreed, that the sale of the plantation and slaves in the parish of Plaquemines, and the land in the parish of West Baton Rouge be annulled and made void; that the case be remanded to be proceeded in according to law, the appellees paying the costs of the appeal.

The decree being made without prejudice to the claim of the creditors for the fruits of the plantation, or that of the purchasers for the improvements placed thereon.

*Livermore* for plaintiffs.—*Hennen & Mazureau* for defendants.